## WASHINGTON SAND & GRAVEL CO. v. BRANN & STUART CO.

### No. 9344.

Circuit Court of Appeals, Third Circuit.
Argued June 4, 1947.
Decided July 14, 1947.

John M. Smith, Jr., of Philadelphia, Pa. (Ronald A. Anderson, of Philadelphia, Pa., on the brief), for appellant.

Thomas J. Clary, Asst. U. S. Atty., of Philadelphia, Pa., (Gerald A. Gleeson, U. S. Atty., of Philadelphia, Pa., on the brief), for appellee.

Before McLAUGHLIN and O'CONNELL, Circuit Judges, and LEAHY, District Judge.

McLAUGHLIN, Circuit Judge.

This is a contract action which was dismissed at the end of appellant's case for failure of proof as to damages. Appellant's motion to set aside the resultant judgment and to allow it a new trial was denied and this appeal followed.

■■ It is a diversity suit. Performance of the contract was in Maryland, which brings the measure of the damages under the law of that state with the specific question of the sufficiency of the evidence, a matter of Pennsylvania law. As said in the leading case of Scudder v. Union National Bank, 91 U.S. 406 at pages 412, 413, 23 L.Ed. 245: "Matters bearing upon the execution, the interpretation, and the validity of a contract are determined by the law of the place where the contract is made. Matters connected with its performance are regulated by the law prevailing at the place of performance. Matters respecting the remedy, such as the bringing of suits, ad-

missibility of evidence, statutes of limitation, depend upon the law of the place where the suit is brought."

And see Restatement, Conflict of Laws, Section 358 and Section 585 et seq. Appellant while urging that Maryland law governs the situation concedes that in the pertinent particulars the law of that state and of Pennsylvania is the same, and both sides accept the fundamental proposition that the damages claimed must rest upon a definite basis and not upon speculation and conjecture. The dispute arises over the application of the principle to the existing facts.

 Appellant is in the sand and gravel business with an office and plant at Prince Georges County, Maryland, and another office in Washington, D. C. Appellee is a contractor who in 1943 was constructing an air field at Camp Springs, Meadows, Maryland, for the Government. On January 13, 1943, appellee issued its written purchase order addressed to the appellant at "Box 611, Bennings, D.C." for 10,000 tons of washed gravel at $1.20 a ton and 10,000 of concrete sand at 70¢ a ton. The order by its terms was subject to increase or decrease to the extent of 25% without any change in unit prices or liability to appellee. Shipments were to start as called for and be completed as called for. Delivery was to be F.O.B. appellee's truck at appellant's bins. Paragraph 1 of the Instructions on the order provides: "Acknowledge receipt of this Purchase Order. Unless acknowledged immediately we reserve the right to cancel." By on or about June 7, 1943, there had been delivered under the contract and paid for, 1,627.35 tons of concrete sand and 1,684.745 tons of washed gravel. On that date appellant received a change in purchase order from appellee which was addressed to "Bennings, D.C." This change decreased the original order by all remaining undelivered sand and gravel and in effect cancelled the balance of the purchase order. Thereafter appellant brought the present action for its alleged losses flowing from the cancelled contract.

The president of the appellant company, George Zouras, was the only witness in its behalf. He testified that at the time the purchase order was signed he was told that the sand and gravel was for the airport and "to keep on stock piling material because they would need it very soon." By the time the decrease change had been received, appellant had stock piled the total sand and gravel called for by the contract. There was no complaint about the sand and gravel which was actually delivered under the order. The balance of the material "stayed in our yard" until the change of purchase order was received in June, 1943, six months after the original order. This was sold later on, but prior to that *"most of the material had to be rewashed over again."* (Emphasis added.) The expense of this amounted to 85% of the original cost of mining and washing. The total original cost per ton for producing both the sand and gravel was 35¢ which gave appellant under the agreement 35¢ a ton profit on the sand and 85¢ a ton on the gravel.[1] The undelivered balance of the sand and gravel was sold by appellant to other purchasers for 10¢ a ton over the contract prices with appellee. The witness further generally stated that because of the contract appellant had refused definite orders at 85¢ a ton for sand and $1.30 for gravel but he made no elaboration of that statement.

At the conclusion of the above testimony the defense moved "to dismiss on the ground that the evidence of the damages is too speculative to justify its submission to the jury." The Court in dismissing the suit concluded that the testimony that "most of the material had to be rewashed over again" gave the jury no basis on which to figure damages regarding that item and that "the other proof about loss of orders was similarly indefinite." He, therefore, found "that there is no proof sufficient in the case to establish any damages for the breach of contract." Regarding the sole witness for the appellant he said:

"He testified that he reprocessed this gravel and sold it for $.10 more, both sand

---

[1] It is noted that the witness in estimating the profit merely subtracts the cost of producing from the selling price.

He makes no mention of any intrinsic value of the sand and gravel prior to being mined.

and gravel, for $.10 more than the original purchase price. That first instance would indicate that there was no damage. In the second place, he didn't show where any damage could arise. He talked about reprocessing the gravel, but he didn't tell us how much gravel he reprocessed, and there is 25% of this upon which no claim can arise under the terms of the contract in any event.

*　*　*　*　*　*

"As a matter of fact, he may have made money."

Following the dismissal of the action on the application to set aside the judgment and grant a new trial, the Court "felt that it would be fair perhaps to let the plaintiff come in and say what he thought he could prove" and informally, without regard to evidential rules, permitted appellant to make an offer of proof. All of the further testimony that appellant "would have additional to what is already in the record * * *" consisted of further testimony by Zouras. He, under the guidance of his attorney, was more specific this time in his figures. He said that the undelivered sand under the contract amounted to 8,372.65 tons and that all of that amount, with the exception of 150 tons in a bin, had to be reprocessed. Regarding the gravel, he stated that 8,315.25 tons were undelivered and that this too, less 150 tons in a bin, was reprocessed. Cross-examined as to how he knew that the material had been rewashed he said, "Because I went there to instruct after we had a talk to see what they need there. We have given instructions for the shovel operation and for the plant to carry on and rewash this material." He had no records of this, saying, "We don't keep records as far as rewashing in concerned." As to seeing the sand rewashed he was asked, "You instructed them to do it but you weren't there to see them do it were you?" And he answered, "I can't stay all day long there. I did stay there as long as I needed to be there and then I come back again to my place." Asked how he knew material was not sold directly from the stock pile he said, "Because I was there. I knew it wasn't done. I can see from the orders coming in, the contracts we have, and it was nothing of the kind for me not to know it."

He said that his manager Griggs did all of appellant's business with appellee and that most of his information came through Griggs. On redirect examination he said he visted the plant on occasion in the three months following June 1, 1943 and had given the men instructions regarding the reprocessing of the material. On the occasions he visited the plant after June 1, 1943 he checked up on the progress that was being made and he reiterated that he was able to state of his own knowledge whether those stock piles were entirely reprocessed. He said he had some records in Court showing appellant's sales but these were not produced. The cost of mining the material, according to him, was 35¢ a ton and the fact that digging was not involved saved about 15% or 5¢ a ton. Cross-examination brought out that the material had become dirty from being stock piled and that, if the appellee had desired, it would have been rewashed at no extra cost to appellee. The witness said that on the day the order was cancelled the material was in such condition, considering the kind of trade appellant had, that "at that time it had to be rewashed again."

At the conclusion of the testimony the District Judge said:

"The Court is still of the opinion that there has been no adequate proof offered here of the amount of this gravel that was rewashed. I have heard this testimony again. I think it is just as vague as it was the other day. He said 'Mostly' the other day. Today he does testify to a positive figure but when it comes to examine the matter he obviously doesn't know. He has no records. He has no corroborating testimony of his own word.

"The Court will be allowing the jury to speculate on the damages when the witness himself is not positive as to his basis.

"If there were any record of any sort here to the amount of this gravel that was reprocessed, the cost of processing, the Court would submit that to the jury; but I see none.

"I will further elaborate that and say that I had the distinct impression the other day that what the witness was testifying to was hearsay to a certain large degree. Now

I still have that impression this morning. I think that the case develops that very clearly in the record as we took it the other day and this morning's record confirms the impression that I had before.

"The Court could not permit the jury to speculate as to the amount of damages and so, therefore, I must say that I feel bound to refuse the offer of proof."

The damage proof as it stood finally, concerned only the reprocessing of the sand and gravel. As seen, there had been an attempt at the trial to show inability to accept orders because of the instant contract. This was palpably too vague for submission to the jury. There was no reference to it in the offer of proof on the motion for a new trial and it is not here contended that a jury question was raised by that evidence. With reference to the reprocessing item, the trial testimony of Zouras went no further than that "most" of the sand and gravel had to be reprocessed. The Trial Judge correctly decided that this was not enough to enable the jury to fairly appraise the claim. Ten days later at the hearing on the motion for a new trial, the same witness said that all of the sand and gravel with the exception of 150 tons of each in bins had to be reprocessed. The District Judge did not reject this as asserted by appellant solely because Zouras did not keep corroborating records. In passing, it does seem rather strange, whether appellant's business was small or large, that under the special circumstances no sort of record was made of the rewashing of the material. But lack of such records of itself would not have been fatal. Nor would the absence of Griggs, the plant superintendent, or other supporting witnesses have prevented appellant from making out a cause of action. The troublesome feature of the offer of proof is that the positive statement as to the amount of material reprocessed is not based on Zouras' own knowledge and is largely derived from hearsay as shown by the record referred to. Without that testimony appellant had nothing.

The Trial Court went to unusual lengths in a sincere endeavor to ascertain whether there was a claim that could be justifiably given to a jury for consideration. In so doing he allowed appellant by a series of most leading questions to develop completely everything it might have by way of proof. Under all the circumstances we cannot say that, in then denying the motion for a new trial for the reasons above quoted, the District Judge abused his discretion. The appellant had been given ample opportunity and a wide latitude to show, if it could, that its suit was entitled to go to the jury. It cannot be seriously maintained that the District Judge was in any way technical or that appellant did not have its full, fair day in court.

Even if Zouras' testimony were admissible there would still remain the uncertainty whether appellant had sustained any damage at all. The material had been resold above the contract price. By June, 1943, all of it with the exception of 300 tons in the bins, was dirty, not fit to be put on the market and had to be rewashed. Rewashing would have been done for the Government at no extra cost to the latter. It is readily inferable from the testimony that this would not have been merely a gesture of cooperation but essential to acceptance by appellee. The evidence plainly indicates that the stock piles were subject to appellee's inspection. As Zouras said, "it was up to their inspectors to tell us. If the material wasn't clean, we could have washed for them."[2] Thus on the one surviving item of alleged damage, the rewashing of the material, it is at least open to grave doubt that appellant suffered any actual loss though it be assumed that the material was rewashed as Zouras stated.

For whatever the reason, appellant failed to comply with the sound basic principle that "the profits claimed must be free from speculation, and must be sufficiently certain to be capable of adequate proof." Lanahan v. Heaver, 79 Md. 413, 421, 29 A. 1036, 1038. And see Commonwealth, to Use of Rothstein, v. Stein, 326 Pa. 225, 192 A. 95; Jessup & Moore Paper Co. v. Bryant Paper Co., 297 Pa. 483, 147 A. 519.

Affirmed.

---

[2] Zouras denied seeing any separate specifications to the order but did say that if his manager Griggs got the specifications "of course he had to follow them."